IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HIP, INC.,                                )
                                          )
            Plaintiff,                    )
                                          )
      v.                                  )   C.A. No. _____
                                          )
HORMEL FOODS CORPORATION,                 )
                                          )
            Defendant.                    )

**COMPLAINT FOR CORRECTION OF**
**PATENT INVENTORSHIP AND OWNERSHIP**

Plaintiff HIP, Inc. ("Plaintiff" or "HIP") files this Complaint against Defendant Hormel Foods Corporation ("Defendant" or "Hormel") for correction of inventorship and ownership of U.S. Patent No. 9,980,498 (the "'498 Patent").

HIP files this Complaint out of an abundance of caution in view of Hormel's pending challenge to HIP's standing in the related lawsuit, C.A. No. 18-802 (CFC) (the "18-802 Case"). HIP believes it has standing in the 18-802 Case, but in an effort to moot Hormel's challenge, reduce the burden of jurisdictional disagreements on the Court and the parties, and to allow the parties to focus on the merits of the dispute, which are now reflected in a Joint Pretrial Order and accompanying materials filed in the 18-802 Case, HIP files the instant lawsuit to obviate any issue as to standing at the onset of the lawsuit. HIP intends to move to consolidate this case with the 18-802 Case, allowing the consolidated case to move forward on the merits.

**PARTIES**

1.      HIP, Inc., is an Oklahoma corporation with its principal place of business in Dallas, Texas. HIP, Inc. was formerly known as Unitherm Food Systems, Inc.

2.      Upon information and belief, Defendant Hormel Foods Corporation is a Delaware

corporation with its principal place of business in Austin, Minnesota. At present, Hormel Foods Corporation is erroneously listed as the owner of record of the '498 Patent by virtue of assignments received from the currently named "inventors."

## NATURE OF THIS ACTION

3.     This is an action for correction of inventorship and ownership arising under the patent laws of the United States, section 256 of Title 35 of the United States Code.

## JURISDICTION AND VENUE

4.     This Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

5.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b) because Defendant resides in this District.

## FACTUAL BACKGROUND

6.     The true and sole inventor of all of the subject matter claimed in the '498 Patent is HIP's president, David Howard. HIP, Inc. has standing to bring this action for correction of inventorship and ownership by virtue of the May 29, 2018 assignment from David Howard to HIP (*see* C.A. No. 18-802, D.I. 5, Exhibit J), attached hereto as Exhibit I, and/or the April 14, 2021 Quitclaim and Assignment from Marlen International, Inc. ("Marlen") to HIP of all rights that Unitherm LLC or Marlen may have had in the '498 Patent, attached hereto as Exhibit H.  HIP reserves the right to bring a further action for correction of inventorship and ownership of any other related Hormel patent application should such application issue as a patent.

### The '498 Patent

7.     The '498 Patent, titled "Hybrid Bacon Cooking System," was issued by the U.S. Patent and Trademark Office on May 29, 2018. The '498 Patent issued from U.S. Patent Application Serial No. 13/207,065, which was filed on August 10, 2011, and claims the benefit of

Provisional Patent Application No. 61/372,560, which was filed on August 11, 2010. A copy of the '498 Patent is attached hereto as Exhibit A.

8.     Through error, the "inventors" currently named in the '498 Patent are Brian J. Srsen, Richard M. Herreid, James E. Mino, and Brian E. Hendrickson. At present, Defendant Hormel Foods Corporation is erroneously listed as the owner of record of the '498 Patent by virtue of assignments which Hormel Foods Corporation has received from all of the named "inventors."

9.     The true and sole inventor of all the subject matter claimed in the '498 Patent is Plaintiff's president, David Howard. Through error, David Howard was omitted as the sole inventor of the '498 Patent. This Complaint therefore seeks a correction of inventorship under 35 U.S.C. §256(b) to name David Howard as the sole inventor of the '498 Patent. Since David Howard assigned all of his rights in the '498 Patent to HIP, this Complaint seeks transfer of ownership of the '498 Patent, and all pending foreign patent applications and/or foreign patents in any way based on U.S. Patent Application Serial No. 13/207,065, Provisional Patent Application No. 61/372,560 and/or the '498 Patent to HIP, the equitable title holder.

10.     The '498 Patent has a total of 16 claims. Claim 1 calls for a method of making precooked bacon pieces using a hybrid cooking system, comprising:

> a) preheating bacon pieces with a microwave oven to a temperature of l40°F to 210°F to create preheated bacon pieces, the preheating forming a barrier with melted fat around the preheated bacon pieces and reducing an amount of condensation that forms on the preheated bacon pieces when transferred to a cooking compartment of an oven, the barrier preventing any condensation that forms from contacting the preheated bacon pieces under the melted fat and diluting flavor in the preheated bacon pieces;

b)  transferring the preheated bacon pieces to the cooking compartment of the oven, the cooking compartment heated with steam from an external steam generator, the external steam generator being external to the cooking compartment, the steam being injected into the cooking compartment and being approximately 400°F to 1000°F when the steam leaves the external steam generator, the cooking compartment including internal surfaces, the steam assisting in keeping the internal surfaces at a temperature below 375°F (i.e., the smoke point of bacon fat) thereby reducing off flavors during cooking in the cooking compartment; and

c)  cooking the preheated bacon pieces in the cooking compartment to a water activity level of 0.92 or less to create precooked bacon pieces.

11.     The remaining claims 2-16 of the '498 Patent either repeat certain limitations called for in claim 1 or variously call for: (i) cooking bacon slices having a thickness of 0.25 inch (6.35 millimeters) or less; (ii) the steam level in the cooking compartment being greater than 90%; (iii) the preheater being either a microwave, infrared or hot air oven; or (iv) the cooking compartment including a heating element to preheat the compartment.

12.     The only oven disclosed in the '498 Patent and used in the patent examples for cooking the preheated bacon is a Unitherm Mini Spiral Oven.

**The Prior Related Patent of David Howard (The "Howard Patent")**

13.     On December 6, 2016, HIP's president, David Howard, was issued U.S. Patent No. 9,510,610 for a "Process for Producing Precooked Bacon Slices" (the "Howard Patent"). The Howard Patent was duly and legally issued by the U.S. Patent and Trademark Office to HIP as the assignee of the inventor, Mr. Howard. A copy of the Howard Patent is attached hereto as Exhibit B.

14.     The Howard Patent discloses and claims various embodiments of what has been referred to as the "Unitherm Process" wherein precooked sliced bacon products are prepared by cooking the bacon in a superheated steam environment in a spiral oven. As expressly called for in claim 2 of the Howard Patent, the Unitherm Process can also optionally include a preheating step.

15.     The process claimed in the '498 Patent is an embodiment of the Unitherm Process which includes a preheating step. Specifically, the process claimed in the '498 Patent is an embodiment of the Unitherm Process wherein the bacon is preheated in a microwave or other oven prior to cooking the bacon in a superheated steam environment in a spiral oven.

**Prior Related Proceedings Between the Parties**

16.     On September 29, 2014, more than two years and two months prior to the issuance of the Howard Patent, Plaintiff brought suit against Hormel in the U.S. District Court for the District of Minnesota (*Unitherm Food Systems, Inc. v. Hormel Foods Corporation and Hormel Foods Corporate Services, LLC*, Case No.: 0:14-CV-04034-JNE/BRK (D. Minn.)) for breach of a Mutual Confidential Disclosure Agreement (the "MCDA") and a Joint Development Agreement (the "JDA") between the parties. Relevant to the present case, Plaintiff also brought a claim for declaratory relief under the terms of the JDA naming Plaintiff the owner of the Hormel patent application for the '498 Patent.

17.     Hormel counterclaimed for (i) breach of the JDA, (ii) a declaration of ownership under the JDA of Hormel's own patent application for the '498 Patent, and (iii) a declaration of ownership of the Unitherm Process as disclosed in Plaintiff's then pending application for the Howard Patent.

18.     On September 14, 2016, more than two and one half months prior to the issuance of the Howard Patent and more than 20 months prior to the issuance of the '498 Patent, a final judgment was entered by the Federal District Court in Minnesota in which the court dismissed,

*with prejudice*, Hormel's declaratory judgment counterclaim for ownership of the Unitherm Process disclosed in the Howard Patent application but dismissed, *without prejudice*, Plaintiff's and Hormel's declaratory judgment claims for ownership of the process claimed in the '498 Patent and disclosed in the then pending Hormel patent application. All other claims of both parties were dismissed with prejudice.

19.    A copy of a summary judgment Order which led to the final judgment is attached hereto as Exhibit C. Relevant to the present action, in rejecting Hormel's attempt to obtain summary judgment on its counterclaim for a declaration that Hormel developed the process disclosed in the Hormel patent application which became the '498 Patent, the court noted "Howard's deposition testimony that during the July 2007 presentation to Hormel, Howard presented the idea of preheating bacon with a microwave before cooking it in a spiral oven." Exhibit C at 10.

20.    Also relevant to the present action, the court found in dismissing *with prejudice* Hormel's counterclaim for ownership of the Unitherm Process disclosed in the Howard Patent Application that (a) "it is undisputed Howard conceived of the Unitherm Process before the JDA's effective date" and (b) "Hormel does not point the Court to any specific improvement in the process that was developed as part of the Project." Exhibit C at 9-10.

21.    Plaintiff filed a Notice of Appeal to the U.S. Court of Appeals for the 8th Circuit on September 19, 2016. Hormel filed a Notice of Cross-Appeal on October 5, 2016.

22.    In a decision issued on April 18, 2018, the 8th Circuit affirmed the judgment of the District Court regarding all claims and counterclaims on appeal. A copy of the 8th Circuit decision is attached hereto as Exhibit D.

23.    The 8th Circuit decision issued 6 weeks prior to the issuance of the '498 Patent. Concerning the parties contractual claims under the JDA for ownership of the process disclosed in

the Hormel application for the '498 Patent, which claims had been dismissed *without prejudice* by the District Court, the 8th Circuit noted that these claims had not been dismissed in this manner to evade the final order doctrine, but rather because the application for the '498 Patent was still pending. The 8th Circuit further noted that the parties had assured the court that the contract claims would not be revived after the appeal. *See* Exhibit D at 4 n.2.

24.     Also relevant to this present action, in affirming the judgment of the District Court against Hormel's counterclaim for ownership of the Unitherm Process disclosed in the Howard Patent, the 8th Circuit held that:

> It is undisputed that Unitherm's Howard brought a developed "Unitherm Process" to Hormel when they entered the JDA in September 2007. Some months later, Unitherm applied for the Unitherm Process patent. Hormel declined invitations to add claims to the application and presented no evidence that any improvements in the Process as patented were developed as part of the Project.

Exhibit D at 13.

25.     The 8th Circuit further affirmed that: "The Unitherm Process, as patented, was conceived by Unitherm and sufficiently reduced to practice to induce Hormel to enter into the JDA." *Id.*   In addition, all of "the information Hormel disclosed to JBT was disclosed in the Unitherm Process patent application . . ." *Id.* at 9.

26.     On May 29, 2018, HIP filed suit in this Court against Defendant and Hormel Foods Corporate Services, LLC, Dold Foods, LLC, Osceola Food, LLC, and Rochelle Foods, LLC (*HIP, Inc. v. Hormel Foods Corporation et al.*, C.A. No. 18-802-CFC-SRF).   HIP's claims in that case, as here, are for correction of inventorship and ownership of the '498 Patent.   HIP's contingent claims for patent infringement were dismissed as premature.   HIP reserves the right to bring a patent infringement action upon the resolution of the instant lawsuit.

**Prior to the Processes Invented by David Howard,**
**Precooked Bacon Was Produced in the U.S. in 100% Microwave Oven Systems**

27.     Prior to the processes invented by David Howard, substantially all commercial manufacturers, including Hormel, used continuous 100% microwave oven systems to produce precooked sliced bacon products for sale in retail and foodservice markets. A continuous microwave oven system typically consists of a series of four or five microwave oven cabinets through which the bacon slices are sequentially conveyed such that the first cabinet begins the heating process and the cooking of the bacon is completed in the final cabinet.

28.     The precooked bacon products produced by these microwave oven systems do not approach the flavor, texture, or appearance of freshly cooked bacon.  Further problems associated with the commercial microwave oven process include: low yields; inconsistent and non-uniform product characteristics; a high fire risk; and high maintenance and energy costs.

29.     The high fire risk in the microwave oven process results not only from electrical arcing problems which are commonly encountered in industrial microwave ovens, but also from the amount of flammable bacon fat which is rendered from the product during cooking. In order for the precooked bacon to qualify as "fully cooked," at least 60% of the raw weight of the bacon must typically be rendered from the product.

30.     In addition, because the microwave oven systems rely upon microwave energy for cooking rather than the creation of a sterilizing high temperature environment in the oven, health safety risks resulting from pathogen contamination in the oven conveyor belt, and elsewhere in the oven itself, are also a concern for the microwave oven process.

31.     For example, positive swabs showing pathogen contamination of microwave oven belts in the precooked bacon section of Hormel's facility in Rochelle, Illinois necessitated the replacement of the oven belts in July 2013 and March 2014.

32.     Microwave ovens in the precooked bacon section of the Rochelle, Illinois facility also tested positive for contamination in January 2013, February 2014, August 2016, and January, March, and August 2017.

33.     The Unitherm Process, performed with or without the optional preheating step, provides significant improvements in product consistency and yield and produces a precooked sliced bacon product which is remarkably similar to freshly cooked bacon.

34.     The Unitherm Process, performed with or without the optional preheating step, also prevents contamination and eliminates fire risks within the oven by cooking the bacon in a sterilizing, superheated steam environment such that an amount of oxygen sufficient for igniting the highly flammable bacon fat is not present within the spiral oven.

### Mr. Howard's Background and Invention of the Processes

35.     HIP's president, David Howard, began business in the United Kingdom in 1985 and expanded operations to the United States in 1993.

36.     Since 1985, Mr. Howard has invented a number of different cooking and heating processes, systems, and ovens. Mr. Howard has also obtained eighteen (18) U.S. patents and has obtained patents in other countries. In addition to U.S. Patent No. 9,510,610 (the "Howard Patent"), Mr. Howard's other patents include: U.S. Patent No. 9,504,258 for "Airflow Pattern for Spiral Ovens"; U.S. Patent No. 9,445,689 for "Transfer Mechanism for a Continuous Heat Transfer System"; U.S. Patent No. 9,345,252 for "Method, Continuous Apparatus, and Burner for Producing a Surface-Roasted Product"; U.S. Patent No. 9,220,276 for "Airflow Pattern for Spiral Ovens"; U.S. Patent No. 9,215,892 for "Pasteurization System for Root Vegetables"; U.S. Patent No. 8,875,621 for "Method, Continuous Apparatus, and Burner for Producing a Surface-Roasted Product"; U.S. Patent No. 9,107,422 for "Airflow Pattern for Spiral Ovens"; U.S. Patent No. 8,728,555 for "Apparatus and Method for Searing, Branding, and Cooking"; U.S. Patent No.

8,646,383 for "Spiral Oven Apparatus and Method of Cooking"; U.S. Patent No. 6,867,392 for "Infrared Element and Oven"; U.S. Patent No. 6,780,448 for "Pasteurization of Food Products"; U.S. Patent No. 6,675,589 for "Freeze-Crusting Process"; and U.S. Patent No. 6,622,513 for "Freeze-Crusting Process and Apparatus."

37.    In 1989, after a series of catastrophic fires in various bacon cooking facilities, Mr. Howard developed a system in the U.K. for cooking bacon slices in a linear convection oven in an environment which included up to about 50% superheated steam. The linear oven, which was also developed by Mr. Howard, was known as the Unitherm RapidFlow Oven.

38.    Two major producers in the U.K., TMI and Sovereign Foods, adopted the process and began using multiple RapidFlow Oven lines for manufacturing precooked bacon.

39.    Mr. Howard's RapidFlow Oven Process included the options of (a) cooking the bacon at a temperature above the smoke point of the bacon fat (i.e., above 375°F) to impart a roasted flavor to the product or (b) maintaining the temperature in the oven below the smoke point of the bacon fat to prevent the addition of the roasted flavor.

40.    The product produced by the RapidFlow Oven Process was a fully cooked sliced bacon product which was rendered to less than 40% of its raw weight, had a water activity level of less than 0.92, and resembled pan-fried bacon.

41.    Because of the length of the linear oven that would be required in most U.S. production lines for producing high volumes of precooked bacon, the RapidFlow Oven system was not a good fit for the U.S. market. Additionally, although elevated superheated steam levels were provided in the linear oven process, Mr. Howard desired to develop a continuous process in which substantially all of the air in the oven was replaced with superheated steam.

42.    In 1994, Mr. Howard conceived the continuous Unitherm Process of cooking sliced bacon in a superheated steam environment in a spiral oven. Mr. Howard recorded his conception

10

of the Unitherm Process in an invention disclosure form.

43.     At that time, however, Plaintiff was awaiting the outcome of patent litigation between others in the industry which would determine whether Plaintiff would be able to produce and sell spiral ovens and spiral oven processes.

44.     In 1995, at the request of Armour Swift Eckrich, Mr. Howard performed an in-depth review of a 100% microwave oven line for cooking bacon at an Armour Swift Eckrich facility.

45.     Plaintiff subsequently entered into discussions with Ferrite Microwave Technologies, a manufacturer of industrial microwave ovens, for a possible purchase of Ferrite by Plaintiff.

46.     In 2004, David Howard conceived the version of the Unitherm Process (i.e., the Unitherm Process with the use of a microwave oven, or other preheater, prior to the spiral oven) which is now claimed in the '498 Patent. Mr. Howard's invention of the process claimed in the '498 Patent is shown in a sketch of the process which was contemporaneously drawn by Mr. Howard in 2004 as follows:



47.     This sketch shows a processing line which consists of a series of five pieces of equipment. Notes 1-5, which correspond to and provide additional information regarding the five pieces of equipment, are provided below the sketch.

48.     Proceeding from left to right, and as explained by the notations in the sketch, the first piece of equipment shown in Mr. Howard's sketch is a Unitherm vertical freeze cruster which had just been patented by Mr. Howard in 2004. The freeze cruster was shown in the sketch as an alternative to the walk-in type freezers which are commonly used in the art for freezing or par freezing the incoming bacon bellies to stiffen the bellies for consistent slicing.

49.     The second piece of equipment shown in Mr. Howard's sketch is a Grote slicer for cutting the bacon bellies into raw bacon slices.

50.     The third piece of equipment shown in Mr. Howard's 2004 sketch is a preheater which, as described in note 3, can be a radio frequency (RF) heater, a microwave (MW) oven, or a RapidFlow (RF) linear convection oven. The preheater produces a "phase change" wherein the preheater can be operated to "thaw" or "heat" the bacon prior to cooking. The sketch also shows that the preheating cabinet could optionally include both a lower conveyor belt and an upper belt (i.e., a flattener) between which the bacon slices would be conveyed to produce a flatter product.

51.     The fourth piece of equipment shown in Mr. Howard's sketch is the spiral oven in which the bacon is cooked as it is conveyed upwardly in a spiral pattern from a bottom inlet to an upper outlet of the oven.

52.     The final piece of equipment is a chiller for chilling the cooked product.

53.     Mr. Howard's conception of the use of a microwave oven as a preheater prior to the spiral oven is further corroborated by Mr. Howard's reference in the 2004 sketch to "Ferrite." Geoff Rawes, who is also mentioned in the 2004 sketch, was the president of the slicer

manufacturer, Grote Co. Mr. Rawes retired from Grote Co. in February 2008.

54.    Mr. Howard's 2004 sketch is shown again below next to Figure 1 of the '498 Patent. For comparison purposes, rectangles highlighting the same subject matter (i.e., a Grote slicer, followed by a microwave oven, followed by a spiral oven having a bottom inlet and an upper outlet) relevant to the claims of the '498 Patent have been added to the drawings. In terms of the relevant subject matter of the claims of the '498 Patent, the drawings are the same.



55.    Mr. Howard successfully performed the Unitherm Process, without preheating, in April and May 2006 using a Unitherm Mini Spiral Oven. The reduction to practice was recorded on video and in a May 4, 2006 file memo titled "Bacon Test Cook" which was prepared by Mr. Howard.

56.    As recorded in the memo, the bacon slices were fully enveloped in a superheated steam cooking medium which filled the spiral oven. In the same manner as specified in the claims of the '498 Patent, the superheated steam was injected into the spiral oven from an external steam generator and thus operated to heat the cooking chamber. As also specified in the claims of the '498 Patent, the May 4, 2006 memo notes that the thickness of the bacon slices will typically be not more than 5 millimeters (0.2 inches).

57.    In addition to the external heat provided by injecting the superheated steam, the cooking medium circulating in the oven was also heated, using heating elements within the oven,

to help preheat the oven and to assist in maintaining the desired operating temperature. The oven heating elements used were electrical elements. However, Mr. Howard noted in the May 4, 2006 memo that thermal oil heating elements, which are commonly used in spiral ovens, could alternatively be used for conducting the Unitherm Process at oven temperatures below 400°F.

58.     Although the reduction to practice in May 2006 did not involve the use of a preheater, Mr. Howard observed that (i) the excess amount of superheated steam which was injected into the spiral oven was being expelled from the oven inlet and outlet; (ii) the excess superheated steam expelled from the inlet was contacting the cold, raw bacon on the infeed portion of the oven conveyor belt prior to entering the oven; and (iii) the resultant heating of the bacon slices prior to entering the oven had the effect of relaxing the bacon, which caused that the slices to lay flatter on the conveyor, as opposed to having something of a banana-type curvature.

### David Howard Fully Disclosed and Taught the
### Claimed Process to Hormel and the Inventors Named on the '498 Patent

59.     Mr. Howard approached Hormel in June 2007 to determine Hormel's interest in replacing its microwave bacon lines with the Unitherm Process. Mr. Howard told Hormel's vice president, Larry Pfeil, that the Unitherm Process involved cooking bacon using superheated steam. Mr. Howard also told Ron Christensen of Hormel that the Unitherm Process used a spiral oven.

60.     Hormel's reaction was that its "opportunity to get ahead of the competition is to jump on this immediately."

61.     On July 20, 2007, immediately after the parties signed the Mutual Confidential Disclosure Agreement (the "MCDA"), David Howard, who was accompanied by Plaintiff's then Commercial Vice President, Tom Van Doorn, described the Unitherm Process to Hormel in detail, including Mr. Howard's version of the Unitherm Process which included the addition of an optional preheating step prior to cooking and browning the bacon slices using superheated steam

in a spiral oven.

62.     Richard Herreid and Brian Srsen, named by Hormel as "inventors" on the '498 Patent, attended this presentation.

63.     Mr. Van Doorn has confirmed that in Mr. Howard's presentation, Mr. Howard disclosed to Hormel the concept of preheating the bacon slices in a microwave oven prior to cooking the bacon using superheated steam in the spiral oven. *See* Exhibit E, Declaration of Thomas Van Doorn, Sr.

64.     In his presentation to Hormel on July 20, 2007, Mr. Howard (a) discussed his extensive background, experience, and prior discoveries in bacon cooking and (b) fully disclosed his invention of the processes, his reduction to practice of the Unitherm Process, and all of the information relevant to the version of the Unitherm Process which is now recited in the claims of the '498 Patent including:

a.     The use of a preheater prior to cooking and browning the bacon slices in a substantially 100% superheated steam environment in a spiral oven;

b.     The preheater could be a microwave oven, a radio frequency heater, a RapidFlow oven or other linear oven using hot air as the heating medium, an infrared oven, or a superheated steam heater;

c.     Plaintiff had earlier been in discussions with Ferrite regarding the possible purchase of the Ferrite company;

d.     A Ferrite microwave oven would be a good option for the preheating step;

e.     Alternatively, the use of a microwave oven for preheating the bacon could be of interest to Hormel as a means of salvaging and reusing microwave oven cabinets which would otherwise be taken out of operation as Hormel's 100% microwave cooking lines were replaced with the Unitherm Process systems;

f.  The microwave or other preheater could be used to thaw the product after slicing or could be used to further preheat the product to any degree desired so long as (i) the preheated product did not reach a temperature of 212° F and (ii) the cooking and browning process was completed in the superheated steam environment in the spiral oven;

g.  Preheating the product would reduce the heating requirements in the spiral oven per pound of product and could therefore be used as a means to reduce the size of the spiral oven and/or increase product throughput and production rates;

h.  The effect of preheating the raw bacon slices to the rendering temperature of the bacon fat and beyond is that a hot fluid layer containing rendered fat forms on the surface of the product and the fluid begins to drip. The hot liquefied fat on the preheated product entering the spiral oven significantly reduces or eliminates the formation and interaction of condensed steam on the surface of the product as compared to the amount of condensate which forms on and interacts with the exposed surface of a cold, non-preheated product which enters the oven at the belly slicing temperature (i.e., circa 26° F);

i.  The Unitherm Process, with or without preheating, produces a fully cooked bacon product (i.e., a product which has been rendered to less than 40% of its raw weight) which resembles pan-fried bacon, is entirely safe for human consumption and has increased shelf life (i.e., has a water activity level of less than 0.92);

j.  Performing the cooking process in the spiral oven at a temperature above the smoke point of the fat (i.e., above 375° F) imparts what Mr. Howard referred to as a "roasting" flavor to the product, and therefore Mr. Howard advised that demonstrations should be conducted at temperatures in the spiral oven both below

and above the smoke point so that Hormel could evaluate whether it preferred the product with or without the roasted flavor;

k.   For the best product and the safest operation in terms of both fire prevention and food safety, sufficient superheated steam should be injected into the spiral oven so that the bacon is cooked in a substantially 100% superheated steam environment;

l.   The superheated steam is injected into the oven from an external generator which heats the cooking chamber of the spiral oven;

m.   In addition to the external heat delivered into the spiral oven by the superheated steam, heat is also provided in the oven by circulating the cooking medium in the oven over a set of internal heating elements;

n.   The heating elements in the spiral oven can be electric, thermal oil or gas elements, with thermal oil being a viable option if a low temperature and/or non- roasting operation below 400°F is preferred; and

o.   The use of the Unitherm Process, with or without preheating, to produce other alternative products including precooked bacon bits.

65.   As confirmed by the deposition testimony of Mr. Van Doorn and of Craig Bernheimer, a former employee of Plaintiff, in the litigation between Plaintiff and Hormel in Minnesota, Mr. Howard not only initially disclosed and explained the preheating concept to Hormel to thaw the product and/or to take the product to a molten state, but continued to discuss these concepts throughout the performance of the JDA. *See* Exhibit F, Deposition of Mr. Van Doorn, p. 174, line 21 – p. 175, line 6; Exhibit G, Deposition of Mr. Bernheimer, p. 110, line 12 – p. 111, line 19.

66.   On July 11, 2007, prior to the signing of the MCDA, without Plaintiff's knowledge, after learning from Mr. Howard that the Unitherm Process used superheated steam

and involved the use of a spiral oven, Hormel attempted to cook bacon in a spiral oven manufactured by Plaintiff's competitor, John Bean Technologies Corporation (JBT). This attempt by Hormel to cook bacon in a JBT spiral oven occurred at JBT's test facility in Sandusky, Ohio.

67.    After the MCDA was signed, Plaintiff demonstrated the Unitherm Process, without preheating except for the effect of the excess steam expelled from the entrance of the oven, for Hormel in August of 2007 using a Unitherm Mini Spiral Oven.

68.    Plaintiff and Hormel then signed the Joint Development Agreement (the "JDA") on September 25, 2007.

69.    Using "source product" (i.e., bacon bellies) which Hormel would provide pursuant to paragraph 2 of the JDA, Plaintiff was tasked under paragraph 3 to "develop the Project to produce a commercially viable end product with all due haste."

70.    If Plaintiff succeeded in this task, Hormel pledged in paragraph 5.c. of the JDA under the heading "Exclusivity" that: (a) "the parties will negotiate an agreement by which UNITHERM will be the exclusive supplier to HORMEL of equipment for an initial five (5) years" and that (b) "Following the initial five (5) year period of exclusivity, the parties will attempt, in good faith, to negotiate an agreement by which the exclusivity period is extended."

71.    Unknown to Plaintiff, Hormel intended that this clause, drafted by Hormel's Senior Attorney, would not be binding on Hormel under Minnesota law, as was later ruled by the District Court in Minnesota.

72.    However, in order to induce Plaintiff to give Hormel a specific bacon product which Hormel desired and to teach Hormel how to produce the product using the Unitherm Process, Hormel led Plaintiff falsely to believe that Hormel would honor its commitment under the Exclusivity clause.

73.    After the JDA was executed, Plaintiff provided additional demonstrations of the

Unitherm Process to numerous Hormel personnel, including Hormel's named "inventors" Srsen and Herreid. The oven used by Plaintiff in performing these demonstrations was the Unitherm Mini Spiral Oven.

74.    The live demonstrations performed by Plaintiff did not include a preheating step. However, Plaintiff advised that the infeed of the Unitherm Mini Spiral Oven would be configured to allow the placement and demonstration of any desired preheating cabinet at the infeed of the spiral oven as had been discussed. Plaintiff also offered, for demonstration purposes, to provide the preheating cabinets at cost if any of the preheating techniques suggested by Plaintiff were of interest to Hormel.

75.    In addition, Plaintiff provided a video to Hormel demonstrating a reduction to practice by Howard, with no Hormel personnel present, of the Unitherm Process with the addition of a superheated steam preheating system outside of the inlet of the spiral oven.

76.    The initial demonstrations provided by Plaintiff were conducted under less than ideal conditions. Plaintiff was in the process of constructing a test kitchen and was awaiting the arrival of a new, higher capacity steam generator which would provide more stable operation of the spiral oven system for performing the Unitherm Process.

77.    However, Hormel desired to proceed with the tests using the smaller steam generator.

78.    Despite difficulties caused by the limited capacity of the old steam generator, Hormel expressed to Plaintiff its satisfaction with the bacon product and the operation of the spiral oven.

79.    Following the eventual delivery of the higher capacity steam generator, Plaintiff performed demonstrations for Hormel on April 17, 2008. Hormel provided 144 bacon bellies for these demonstrations. These demonstrations included all of the steps and requirements recited in

the claims of the '498 Patent, except for the use of a preheater.

80.     Specifically, the demonstrations conducted by Plaintiff on April 17, 2008, included: (a) using Plaintiff's new external steam generator to generate pressurized (i.e., greater than 50 psig) superheated steam at a temperature above 400°F; (b) injecting the superheated steam into the spiral oven to add external heat to the oven for preheating and cooking, and to provide and maintain a substantially 100% superheated steam cooking environment; (c) slicing the bacon to a thickness of 0.2 inch or less; (d) operating the spiral oven at a temperature of 350°F; and (e) the successful demonstration of the production of products which intentionally did and did not include smoke point flavor notes. In addition to the external heating of the oven by the superheated steam, heat was also provided in the oven by passing the vapor cooking medium over a set of internal heating elements.

81.     Hormel expressed great satisfaction with the bacon product produced under these conditions. The product was a fully cooked sliced bacon product which had been rendered to less than 40% of its original raw weight and had a water activity level of less than 0.92.

82.     Following the demonstrations on April 17, 2008, Hormel's vice president, Larry Pfeil, assured Plaintiff that "everyone that counted" at Hormel was on board with the bacon project. Hormel then rented the Unitherm Mini Spiral Oven, ostensibly for further tests. The oven was shipped to Hormel's R&D facility in Austin, Minnesota.

83.     In January 2009, Hormel instructed Plaintiff to send Hormel a quote for a scaled-up version of the Unitherm spiral oven having an increased capacity for use in a large commercial line to cook 20 million pounds per year of bacon. Hormel also instructed Plaintiff to provide a quote for a correspondingly sized spiral chiller for chilling the product.

84.     Providing scaled-up spiral ovens of this size was not new for Plaintiff. At that time, Plaintiff was selling the Unitherm spiral oven in three size ranges, Mini, Medium, and Large, and

had offered to demonstrate the Unitherm Process to Hormel using either the Mini or the Large. Hormel selected the Mini Spiral Oven.

85.     Hormel did not respond negatively to the quotes. However, Hormel never issued purchase orders for the scaled-up Unitherm spiral oven and chiller.

86.     Later, in addition to finding that the Exclusivity clause of the JDA was only an invalid agreement to negotiate, the District Court dismissed Plaintiff's claim for breach of the JDA because: (a) in the District Court's view as affirmed by the 8th Circuit, the JDA Project was limited solely to the development of a commercial oven and (b) Plaintiff's evidence showing that quality bacon had been produced was therefore irrelevant. *See* Exhibit C at 3-4.

87.     During the initial stage of the demonstrations provided to Hormel, Plaintiff discovered as a result of a press release by JBT on December 5, 2007, that Hormel had attempted to cook bacon using superheated steam in a spiral oven at JBT's facilities in Sandusky, Ohio, and that Hormel had thus disclosed these concepts to JBT.

88.     Having been persuaded by Hormel that Hormel could be trusted to act in good faith going forward and would honor its commitments, Plaintiff elected to continue to work with Hormel under the JDA in order to obtain the right, as assured by Hormel, to be the exclusive supplier of equipment related to all of the commercial production lines which would be built by Hormel.

89.     However, because of the JBT press release, and being concerned that JBT would attempt to beat Plaintiff to the Patent Office, Plaintiff filed the original US application 12/013,337 for the Howard Patent on January 11, 2008. Plaintiff informed Hormel of the patent application. Hormel did not object. Plaintiff also provided drafts of the application to Hormel's named "inventor" Herreid and to others at Hormel for review.

90.     Hormel did not request that any Hormel employee be named as an inventor in the

Howard Patent Application and never identified any Hormel employee whom Hormel claims to have invented any subject matter which is claimed or disclosed in the Howard Patent.

91.     Relevant to the subject matter of the claims granted in the '498 Patent, the specification of the Howard Patent further confirms Mr. Howard's invention of the concepts of: injecting superheated steam into the bacon oven to provide external heat and to maintain a substantially 100% superheated steam cooking environment (Exhibit B, Column 4, lines 37-40); a low temperature operation of 325°F (*id*. at Column 7, lines 30-32); the use of thermal oil heating elements in the oven as a means of providing additional heat (*id*. at Column 7, lines 41- 44); and the operation at low temperature to eliminate smoke and provide a product with no pit flavor notes (*id*. at Column 7, lines 38-40). The Howard Patent also indicates a preferred slicing thickness of less than 0.2 inch (5 millimeters).

92.     In honor of its exclusive relationship with Hormel under the JDA and in anticipation of the future exclusive supplier contract which Hormel had pledged, falsely, to award to Plaintiff, and which Hormel also continued falsely to give every impression of honoring, Plaintiff declined inquiries from large bacon producers Kraft/Oscar Mayer and Cargill, did not present videos of the Unitherm Process at trade shows, and did not promote the Unitherm Process in other ways.

93.     Without Plaintiff's knowledge, after the rented Unitherm Mini Spiral Oven was shipped to Hormel's R&D facility, Hormel began using the Unitherm Process with the microwave preheating step (i.e., the Hybrid Process) which had been invented and disclosed to Hormel by David Howard.

94.     After taking possession of the Unitherm Mini Spiral Oven, Hormel ceased sharing information with Plaintiff, other than to say that the Unitherm Process was producing bacon so good that it was "too good."

95.    Without Plaintiff's knowledge, Hormel moved the Unitherm Mini Spiral Oven and Process to the USDA inspected facility of Osceola Food, LLC in Osceola, Iowa, where it used the Unitherm spiral oven, with preheating, to produce precooked sliced bacon.

96.    For example, in February 2012, the Unitherm Mini Spiral Oven was placed in full time, single shift, commercial operation at the Osceola facility using Mr. Howard's hybrid process to produce a labeled, precooked sliced bacon product for foodservice customers. Production from the line was then doubled for the period extending from March through November by moving to a two-shift operation.

97.    On April 1, 2010, Hormel sent Plaintiff a letter terminating the JDA, stating that no commercially viable results had been achieved.

98.    The termination letter stated that Hormel was seeking approval to purchase the Unitherm spiral oven. However, the letter did not inform Plaintiff that Hormel intended to continue to use the Unitherm Mini Spiral Oven and the hybrid process to cook bacon.

99.    Rather, Hormel intentionally led Plaintiff falsely to believe that Hormel would not be using the Unitherm Process, in any form, or the Unitherm Mini Spiral Oven to cook bacon.

100.    Having been led falsely to believe that the bacon project was now abandoned and that Hormel desired to retain the Unitherm Mini Spiral Oven solely for testing other types of cooking processes for other products, Plaintiff sold the used oven to Hormel. The terms of the sale provided that the sale of the oven did not include the transfer of any intellectual property rights.

101.    Unknown to Plaintiff, just 19 weeks after the termination letter, Hormel filed U.S. Provisional Patent Application No. 61/372,560 for the "Hybrid Bacon Cooking System". Also unknown to Plaintiff, Hormel then filed U.S. Utility Patent Application No. 13/207,065 which claims the benefit of the provisional application.

102.    Although Plaintiff's president, David Howard, is the true and sole inventor of the

subject matter of all of the claims of the '498 Patent, Hormel did not inform Plaintiff of the filing of the patent applications and did not name David Howard as the inventor of the subject matter claimed. Rather, through error, the "inventors" named on the '498 Patent are Hormel employees Brian J. Srsen, Richard M. Herreid, James E. Mino, and Brian E. Hendrickson.

## COUNT I
### (Claim for Correction of Inventorship and Ownership)

103.   HIP re-alleges and incorporates herein by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

104.   HIP's president, David Howard, conceived all of the subject matter called for in each of the claims of the '498 Patent prior to the filing on August 11, 2010 of the Provisional Patent Application No. 61/372,560 from which the '498 Patent was eventually issued.

105.   Mr. Howard's conception of the invention was of the complete and operative process as called for in each of the claims of the '498 Patent so that one of ordinary skill in the art would understand the invention and could readily carry it out.

106.   Also prior to the filing of the Provisional Patent Application No. 61/372,560 from which the '498 Patent was eventually issued, Mr. Howard shared the full details of his invention as called for in each of the claims of the '498 Patent with Hormel, including Hormel's named "inventors" Mr. Srsen and Mr. Herreid, so that Hormel was readily able to carry out Mr. Howard's invention.

107.   By virtue of Mr. Howard's sole conception of the entire process as called for in each claim of the '498 Patent and his sharing of the full details of his invention with Hormel and the named "inventors" on the '498 Patent so that Hormel and the named "inventors" on the '498 Patent were enabled to carry out Mr. Howard's invention, Mr. Howard is and rightfully should be named as the true and sole inventor of the '498 Patent.

108.   Mr. Howard assigned all of his rights in the '498 Patent to HIP. In addition, to the extent that any such rights were transferred to Marlen contrary to the parties' intent, Marlen has executed a Quitclaim and Assignment, assigning any such rights to HIP.  Therefore, HIP holds equitable title to the '498 Patent.

109.   Through error, Brian J. Srsen, Richard M. Herreid, James E. Mino, and Brian E. Hendrickson were named as the inventors of the '498 Patent.

110.   Through error, David Howard was omitted as the sole inventor of the '498 Patent.

111.   HIP, as the assignee of all right, title, and interest in and to the '498 Patent, has therefore been damaged by the failure to name Mr. Howard as the sole inventor, or in the alternative, joint inventor of the '498 Patent.

112.   Pursuant to 35 U.S.C. § 256, Plaintiff is entitled to (a) a judgment and declaration that David Howard is the sole inventor of the '498 Patent and that HIP, by virtue of assignment, is the sole owner of all rights in the '498 Patent, as well as all rights in any additional patents issued in the United States and/or patent applications issued or pending in any foreign countries which claim priority from U.S. Patent Application Serial No. 13/207,065, Provisional Patent Application No. 61/372,560, and/or the '498 Patent and (b) an order from the Court directing the Director of the U.S. Patent and Trademark Office to issue a certificate of correction and directing Hormel Foods Corporation to assign the '498 Patent and all related United States patents to HIP, and an order from the Court compelling Hormel to assign all such foreign patent applications or patents to HIP.

113.   By virtue of Mr. Howard's sole inventorship of and HIP's ownership of all rights in the '498 Patent, Hormel has no right or permission to use the process claimed in the '498 Patent to produce BACON 1 or any other product.

## COUNT II
### (Alternative Claim for Correction of Co-Inventorship and Co-Ownership)

114.    HIP re-alleges and incorporates herein by reference the allegations in each of the preceding paragraphs as if fully set forth herein.

115.    In the alternative to Count I set forth above, if it is adjudged that David Howard is not the sole inventor of the '498 Patent but instead made an inventive contribution to any claim of the '498 Patent, then, pursuant to 35 U.S.C. § 256, HIP is entitled to a judgment that David Howard is a co-inventor of the '498 Patent and of all United States patents or foreign patents and/or foreign patent applications claiming priority to the '498 Patent and/or either or both of the applications from which the '498 Patent derived and that HIP, by virtue of assignment, is a joint owner of the '498 Patent under 35 U.S.C. § 262, as well as any additional patents in the United States or patents and/or patent applications in any other country which claim priority from the '498 Patent and/or either or both of the applications from which the '498 Patent derived.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff HIP, Inc. prays for judgment and seeks relief against Defendant Hormel Foods Corporation as follows:

A.  For a judgment and declaration that David Howard is the sole inventor of  the '498 Patent and that Plaintiff is the sole owner of all rights in the '498 Patent and of any patents or patent applications in other countries which claim priority from the '498 Patent and/or either or both of the applications from which the '498 Patent derived;

B.  For an order pursuant to 35 U.S.C. § 256 requiring the Director of the United States Patent and Trademark Office to issue a Certificate to correct the inventorship of the '498 Patent to name David Howard as the sole inventor of the '498 Patent and to remove Brian J. Srsen, Richard M. Herreid, James E. Mino, and Brian E. Hendrickson as inventors;

C.  For an order that Hormel assign the '498 Patent, all United States patents or foreign patents and/or patent applications which claim priority from the '498 Patent and/or either or both of the applications from which the '498 Patent derived, and all United States patents or patents and/or patent applications in other countries which claim priority from the '498 Patent and/or either or both of the applications from which the '498 Patent derived, to HIP, Inc.;

D.  For judgment and an award of all interest and costs; and

E.  For a judgment and an award of such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

Karen Jacobs (#2881)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
kjacobs@morrisnichols.com
mflynn@morrisnichols.com
  *Attorneys for HIP, Inc.*

OF COUNSEL:

Jerry R. Selinger
Susan E. Powley
PATTERSON + SHERIDAN LLP
1700 Pacific Avenue, Suite 2650
Dallas, TX  75201
(214) 272-0958

B. Todd Patterson
PATTERSON + SHERIDAN LLP
24 Greenway Plaza, Suite 1600
Houston, TX  77046
(713) 623-4844

Dennis Brown
BROWN PATENT LAW, P.L.L.C.
2700 N. Hemlock Ct., Suite 111 E
Broken Arrow, OK  74012
(918) 615-3357

April 15, 2021